**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1124

UMG RECORDINGS, INC.; CAPITAL RECORDS, LLC; WARNER BROS RECORDS INC.; ATLANTIC RECORDING CORPORATION; ELEKTRA ENTERTAINMENT GROUP INC.; FUELED BY RAMEN LLC; NONESUCH RECORDS INC.; SONY MUSIC ENTERTAINMENT; SONY MUSIC ENTERTAINMENT US LATIN LLC; ARISTA RECORDS LLC; LAFACE RECORDS LLC; ZOMBA RECORDING LLC,

Plaintiffs – Appellants,

v.

TOFIG KURBANOV, d/b/a FLVTO.BIZ, a/k/a 2CONV.COM; DOES 1-10,

Defendants – Appellees.
_____

COPYRIGHT ALLIANCE; INTERNATIONAL ANTICOUNTERFEITING COALITION; MOTION PICTURE ASSOCIATION OF AMERICA, INC.; ASSOCIATION OF AMERICAN PUBLISHERS,

Amici Supporting Appellants,

ELECTRONIC FRONTIER FOUNDATION,

Amicus Supporting Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:18–cv–00957–CMH–TCB)

Argued: April 24, 2020                                    Decided: June 26, 2020

Before GREGORY, Chief Judge, FLOYD, and THACKER, Circuit Judges.

Reversed and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Floyd and Judge Thacker joined.

**ARGUED:** Ian Heath Gershengorn, JENNER & BLOCK LLP, Washington, D.C., for Appellants. Evan M. Fray-Witzer, CIAMPA FRAY-WITZER, LLP, Boston, Massachusetts, for Appellees. **ON BRIEF:** Ishan K. Bhabha, Alison I. Stein, Jonathan A. Langlinais, JENNER & BLOCK LLP, Washington, D.C., for Appellants. Valentin Gurvits, BOSTON LAW GROUP, PC, Newton, Massachusetts; Matthew Shayefar, LAW OFFICE OF MATTHEW SHAYEFAR, PC, West Hollywood, California, for Appellees. David E. Weslow, Megan L. Brown, Ari S. Meltzer, WILEY REIN LLP, Washington, D.C., for Amicus Association of American Publishers. Robert H. Rotstein, Los Angeles, California, J. Matthew Williams, MITCHELL SILBERBERG & KNUPP LLP, Washington, D.C., for Amicus The Motion Picture Association of America, Inc. Michael E. Kientzle, Washington, D.C., John C. Ulin, ARNOLD & PORTER KAYE SCHOLER LLP, Los Angeles, California, for Amici The Copyright Alliance and International Anticounterfeiting Coalition. Mitchell L. Stoltz, ELECTRONIC FRONTIER FOUNDATION, San Francisco, California, for Amicus Electronic Frontier Foundation.

GREGORY, Chief Judge:

This appeal concerns whether a defendant, sued by twelve U.S. record companies for alleged copyright infringement, is subject to specific personal jurisdiction in Virginia. The district court, in granting the defendant's motion to dismiss, concluded that he is not subject to personal jurisdiction in any federal forum. We disagree and, for the reasons that follow, reverse the ruling of the district court and remand for further proceedings.

I.

On August 8, 2018, Plaintiffs–Appellants—twelve record companies that produce, distribute, and license approximately 85% of commercial sound recordings in the United States[1]—commenced this action against Defendant–Appellee Tofig Kurbanov. Appellants are all Delaware corporations, with eight having their principal place of business in New York, three in California, and one in Florida. Kurbanov, born in Rostov-on-Don, Russia, is a Russian citizen who still resides in Rostov-on-Don.

According to Appellants' complaint, Kurbanov owns and operates the websites www.flvto.biz ("FLVTO") and www.2conv.com ("2conv," and together, the "Websites"). The Websites offer visitors a "stream-ripping" service through which audio tracks may be extracted from videos available on various platforms (e.g., YouTube) and converted into a

---

[1] More specifically, they are UMG Recordings, Inc.; Capitol Records, LLC; Warner Bros. Records Inc.; Atlantic Recording Corporation; Elektra Entertainment Group Inc.; Fueled by Ramen LLC; Nonesuch Records Inc.; Sony Music Entertainment; Sony Music Entertainment US Latin LLC; Arista Records LLC; LaFace Records LLC; and Zomba Recording LLC.

downloadable format (e.g., mp3). A large portion, perhaps a majority, of the streams ripped using the Websites is alleged to derive unlawfully from YouTube videos.

The Websites, however, are capable of ripping the audio components from a wide variety of sources. According to Kurbanov, "professors or students might choose to download the audio portions of lectures for later reference and playback," "bands may want to capture the audio tracks from their live performances that they have captured on video," or "parents may want the audio portion of a school concert that they recorded." J.A. 68. Neither Appellants nor YouTube have sanctioned any illicit ripping of audio streams. Indeed, according to Appellants, the Websites' conversion process circumvents the technological measures implemented by YouTube to control access to content maintained on its servers and to prevent illicit activities such as stream ripping.

The Websites are free to use, and visitors need not create an account or register any information to use the stream ripping services. Visitors, however, must agree to the Websites' Terms of Use by checking a box before they can download any audio files. The Terms of Use explain that they "constitute a contractual agreement between [the visitor] and [FLVTO or 2conv]" and that they give Kurbanov "the right to take appropriate action against any user . . . including civil, criminal, and injunctive redress." J.A. 158, 168. The Terms of Use also compel visitors to submit and consent to personal jurisdiction in Russia and anywhere else they can be found. Beyond requiring visitors to accept the Terms of Use, Kurbanov does not maintain any relationship with visitors to the Websites.

Since visitors do not pay to use stream ripping services, virtually all revenues generated by the Websites come from advertisements. Kurbanov does not sell advertising

4

space on the Websites directly to advertisers. Instead, he sells spaces on the Websites to advertising brokers, most of whom are based in Ukraine but at least two are based in the United States (*i.e.*, MGID in New York and Advertise.com in California). The advertising brokers then resell those spaces to advertisers. According to the complaint, some of the advertising brokers and advertisers are interested in the Websites' "geolocation" or "geo-targeting" capabilities. That is, advertising brokers or advertisers might want to display specific advertisements to specific blocks of countries, states, or even cities.

Notably, according to Kurbanov, he has little control over the relationship between advertising brokers and advertisers. For instance, neither the Websites themselves nor advertising spaces for sale are advertised in any way in the United States or anywhere else. Kurbanov also does not have any direct relationship or communication with any of the advertisers, only brokers. He further has no control over the selection of any location-specific advertising. The privacy policies on the Websites, though, explain that visitors' IP addresses, countries of origin, and other non-personal information may be collected "to provide targeted advertising." J.A. 176, 178.

The Websites are successful, in part, because they are two of the most popular stream-ripping websites in the world and are among the most popular websites of any kind on the Internet. According to Kurbanov's own data, between October 2017 and September 2018, the Websites attracted well over 300 million visitors from over 200 distinct countries around the world.[2] Together, the Websites attracted over 30 million visitors (or about 10%

---

[2] The Websites are also available in approximately two dozen languages.

of all traffic) from the United States. Indeed, of all the visitors to FLVTO and 2conv, the United States was the third and fourth most visited country, respectively.

Within the United States, hundreds of thousands of visitors came from Virginia during the same period. Of all visitors to FLVTO, nearly 500,000 (or about 2% of all domestic visitors) came from Virginia, making it the 13th most popular state. Similarly, about 95,000 (or about 2%) of 2conv's domestic visitors came from Virginia, making it the 11th most popular state.[3]

Beyond visitors, the Websites have some other connections to the United States generally and Virginia more specifically. The Websites' domain names are registered with www.GoDaddy.com, a U.S.-based registrar of domain names. The Websites' top-level domains—the suffixes ".com" and ".biz"—are administered by the companies Neustar, Inc. (FLVTO) and VeriSign, Inc. (2conv), both of which are headquartered in Virginia. The Websites have also registered a Digital Millennium Copyright Act agent with the U.S. Copyright Office. Finally, until July 2018, the Websites' servers were hosted by Amazon Web Services, which has servers physically located in Virginia.[4]

Essentially all of the work that Kurbanov has performed on the Websites has been performed in Russia, and he has never performed any work on the Websites from within the United States. He also operates the Websites entirely from Russia. He has never had

---

[3] The figures for the number of visits, as opposed to unique visitors, are proportionally similar.

[4] Since July 2018, the Websites have been hosted by Hetzner Online GmbH, a German-based company without servers anywhere in the United States.

employees anywhere in the United States or owned or leased real estate anywhere here. Neither has he held a bank account or paid taxes in the United States. Kurbanov has never been to Virginia or anywhere else in the United States and claims that it would be extremely burdensome and costly for him to travel to Virginia or anywhere else in the United States for trial and other proceedings. Among other reasons, he does not currently have a visa to visit, has never applied for, or has never obtained a visa to visit the United States, and it would be extremely difficult for him to do so.[5]

In their complaint, Appellants alleged that the Websites are a facilitator of music piracy and asserted five claims for separate violations of the Copyright Act. As to personal jurisdiction, Appellants alleged the district court had specific jurisdiction under Federal Rule of Civil Procedure 4(k)(1) because of Kurbanov's contacts with Virginia and, in the alternative, under Rule 4(k)(2), because of his contacts with the United States more generally. In response, Kurbanov timely filed a motion to dismiss for lack of personal jurisdiction, or in the alternative, transfer the action to the district court for the Central District of California.

On January 12, 2019, the district court granted Kurbanov's motion to dismiss for lack of personal jurisdiction. The district court found the Websites are semi-interactive, visitors' interactions with them are non-commercial in nature, and there were no other acts

---

[5] According to the Department of State, visa services are available in Moscow, Yekaterinburg, and Vladivostok. *See* https://ru.usembassy.gov/visas (saved as ECF opinion attachment). Kurbanov states that, from where he lives in Rostov-on-Don, it is a 12-hour drive to Moscow, a 28-hour drive to Yekaterinburg, and nearly a 12-hour flight to Vladivostok.

by Kurbanov that established purposeful targeting. As a result, Kurbanov did not purposefully avail himself of the benefits and protections of either Virginia or the United States. The district court then concluded that exercising personal jurisdiction over Kurbanov in any federal forum would violate due process under both Rule 4(k)(1) and 4(k)(2).[6]

On January 31, 2019, Appellants filed a timely notice of appeal.

## II.

We review *de novo* the district court's ruling that it lacked personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). *Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 300 (4th Cir. 2012). Under Rule 12(b)(2), a defendant "must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). The plaintiff must establish personal jurisdiction by a preponderance of the evidence but need only make a prima facie showing. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). In considering whether a plaintiff has met this burden, a court may look beyond the complaint to affidavits and exhibits in order to assure itself of personal jurisdiction. *Grayson*, 816 F.3d at 269. A court must also "construe all relevant pleading allegations in the light most favorable to the

---

[6] Having reached this conclusion, the district court declined to engage in a reasonability analysis and denied Appellants' request for jurisdictional discovery. The court also found that it need not address whether transfer to the Central District of California would be appropriate as that venue would also be without jurisdiction.

8

plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Combs*, 886 F.2d at 676.

III.

As a threshold matter, the parties agree that there is no general personal jurisdiction over Kurbanov in Virginia. They instead dispute whether there is specific personal jurisdiction over Kurbanov in Virginia, which Appellants assert under Rule 4(k)(1) or, in the alternative, Rule 4(k)(2).

Rule 4(k)(1) provides that the district court may exercise personal jurisdiction over Kurbanov if he is "subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located," *i.e.*, Virginia. Fed. R. Civ. P. 4(k)(1). That exercise of personal jurisdiction over Kurbanov is lawful "if [1] such jurisdiction is authorized by the long-arm statute of the state in which it sits and [2] the application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009). Here, Virginia's long-arm statute[7] extends personal jurisdiction over nonresident defendants to the full extent permitted by the Fourteenth Amendment's Due Process Clause. *See, e.g.*, *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 293 (4th Cir. 2009); *Peninsula Cruise, Inc. v. New River Yacht Sales, Inc.*, 257 Va. 315 (1999). "Because Virginia's long-arm

---

[7] Virginia's long-arm statute specifically provides that a court "may exercise personal jurisdiction over a person . . . as to a cause of action arising from the person's . . . transacting any business in [the state]." Va. Code Ann. § 8.01–328.1(A)(1).

statute is intended to extend personal jurisdiction to the extent permissible under the due process clause," the statutory and constitutional inquiries merge into one inquiry. *Consulting Eng'rs Corp.*, 561 F.3d at 277 (citation omitted). Thus, the district court has jurisdiction over a nonresident defendant, like Kurbanov, if the exercise of such jurisdiction comports with the strictures of constitutional due process.

Rule 4(k)(2) similarly provides that the district court may exercise personal jurisdiction over Kurbanov if he is "not subject to jurisdiction in any state's courts of general jurisdiction" and doing so would be consistent with constitutional due process. Fed. R. Civ. P. 4(k)(2). The district court performs the same due process analysis as the analysis under Rule 4(k)(1), only the analysis is applied to the entirety of the United States, as opposed to Virginia. *See Base Metal Trading v. OJSC Novokuznetsky Aluminum Factory*, 283 F.3d 208, 215 (4th Cir. 2002) ("Rule 4(k)(2) allows a federal court to assert jurisdiction in cases 'arising under federal law' when the defendant is not subject to personal jurisdiction in any state court, but has contacts with the United States as a whole.").

To meet the constitutional due process requirements for personal jurisdiction, whether under Rule 4(k)(1) for Virginia or Rule 4(k)(2) for the United States, Kurbanov must have "minimum contacts" such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Consulting Eng'rs Corp.*, 561 F.3d at 277 (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945)). The minimum contacts inquiry requires Appellants to show that Kurbanov "purposefully directed his activities at the residents of the forum" and that Appellants' causes of action "arise out of" those

activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citation and quotation omitted). The inquiry is designed to ensure that Kurbanov is not "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Id.* at 475. In other words, it protects him from having to defend himself in a forum where he did not anticipate being sued. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *see also ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 623 (4th Cir. 1997) (underscoring that minimum contacts must have been so substantial that "they amount to a surrogate for presence and thus render the exercise of sovereignty just").

More recently, the Supreme Court also stressed that the minimum contacts analysis must focus "on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (explaining that the "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there"); *see Bristol–Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1781 (2017) ("In order for a court to exercise specific jurisdiction over a claim, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.").

We have synthesized the due process requirements for asserting specific personal jurisdiction into a three-prong test: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp.*, 561 F.3d at 278 (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712

11

(4th Cir. 2002) (quotations and citations omitted)). The district court concluded Kurbanov did not take any actions to purposefully avail himself of Virginia, and Appellants' claims did not arise out of forum-related activities. We disagree with these determinations and will now address each prong in turn.

A.

The first prong, purposeful availment, concerns whether and to what extent "the defendant purposefully avail[ed] himself of the privilege of conducting business under the laws of the forum state." *Consulting Eng'rs Corp.*, 561 F.3d at 278. We have previously noted that this prong is not susceptible to a mechanical application and set forth a list of various nonexclusive factors to consider:

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

*Sneha Media & Entm't, LLC v. Associated Broad. Co. P. Ltd.*, 911 F.3d 192, 198–99 (4th Cir. 2018) (citing *Consulting Eng'rs Corp.*, 561 F.3d at 278). Relevant to this analysis are the *quality* and *nature* of the defendant's connections, not merely the number of contacts between the defendant and the forum state. *Tire Eng'g*, 682 F.3d at 301. Through an analysis of these nonexclusive factors, if a court finds that Kurbanov has availed himself of the privilege of conducting business in Virginia, specific personal jurisdiction exists.

12

*See Consulting Eng'rs Corp.*, 561 F.3d at 278 ("[B]ecause [the defendant's] activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." (alterations in original) (quoting *Burger King*, 471 U.S. at 476)).

In the context of online activities and websites, as here, we have also recognized the need to adapt traditional notions of personal jurisdictions. We have adopted the "sliding scale" model articulated in *Zippo Manufacturing Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119 (W.D. Pa. 1997), to help determine when a defendant's online activities are sufficient to justify the exercise of personal jurisdiction. *See ALS Scan*, 293 F.3d at 707.[8] Regardless of where on the sliding scale a defendant's web-based activity may fall, however, "[w]ith respect to specific jurisdiction, the touchstone remains that an out-of-state person have engaged in some activity *purposefully directed* toward the forum state . . . creat[ing] a substantial connection with the forum state." *ESAB Grp., Inc.*, 126 F.3d at 625 (internal quotation marks and alteration omitted).

With these guiding principles in mind, we conclude that Kurbanov's contacts with Virginia are sufficient to establish purposeful availment. As an initial matter, the Websites are certainly interactive to a degree, since they collect certain personal information from visitors and visitors must agree to certain terms and conditions in order to access

_____

[8] The *Zippo* test establishes a sliding scale—interactive, semi-interactive, and passive—and states that the exercise of personal jurisdiction is justified when a nonresident defendant "(1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *ALS Scan*, 293 F.3d at 713–14 (citing *Zippo*, 952 F. Supp. at 1124).

13

downloadable files. Whether the Websites are highly interactive or semi-interactive, however, is not determinative for purposes of personal jurisdiction. We recently recognized that "[t]he internet we know today is very different from the internet of 1997, when *Zippo* was decided." *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 141 n.5 (4th Cir. 2020) (noting, on today's Internet, "[i]t is an extraordinarily rare website that is not interactive at some level") (citation omitted). Were we to "attach too much significance on the mere fact of interactivity, we risk losing sight of the key issue in a specific jurisdiction case—whether the defendant has purposefully directed [his] activities at residents of the forum." *Id.* at 142.

Instead, we find there are more than sufficient facts raised to conclude that Kurbanov has purposefully availed himself of the privilege of conducting business in Virginia and thus had a "fair warning" that his forum-related activities could "subject [him] to [Virginia's] jurisdiction." *See Burger King*, 471 U.S. at 472. To start, his contacts with Virginia are plentiful. In the relevant period, between October 2017 and September 2018, more than half a million unique visitors went to the Websites, totaling nearly 1.5 million visits. These visits made Virginia one of the most popular states in terms of unique visitors as well as number of visits.

In addition to the volume of visitors, we also find the nature of the repeated interaction between the Websites and visitors to be a commercial relationship. Of course, the Websites are free to use, and no cash is exchanged. But the mere absence of a monetary exchange does not automatically imply a non-commercial relationship. It is hardly unusual for websites to be free to use in today's Internet because many corporations "make money

14

selling advertising space, by directing ads to the screens of computers employing their software." *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 926–27 (2005).

Here, the visitors' acts of accessing the Websites (and downloading the generated files) are themselves commercial relationships because Kurbanov has made a calculated business choice not to directly charge visitors in order to lure them to his Websites. Kurbanov then requires visitors to agree to certain contractual terms, giving him the authority to collect, among other information, their IP addresses and country of origin. Far from being indifferent to geography, any advertising displayed on the Websites is directed towards specific jurisdictions like Virginia. Kurbanov ultimately profits from visitors by selling directed advertising space and data collected to third-party brokers, thus purposefully availing himself of the privilege of conducting business within Virginia.

We are not persuaded by Kurbanov's attempt to distance himself from this commercial arrangement by contending that any commercial relationship that may exist lies with advertising brokers, as opposed to directly with the advertisers or visitors. According to Kurbanov, he lacks any control over what advertising is displayed because of this lack of a commercial relationship. But at a minimum, Kurbanov facilitates targeted advertising by collecting and selling visitors' data. While he has outsourced the role of finding advertisers for the Websites to brokers, the fact remains that he earns revenues precisely because the advertising is targeted to visitors in Virginia. Moreover, as one court appropriately concluded, "it is immaterial whether the third-party advertisers or [the defendant] targeted California residents," or Virginia residents in Kurbanov's case. *See*

15

*Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1230 (9th Cir. 2011). "The fact that the advertisements targeted California [or here, Virginia] residents indicates that [the defendant] knows—either actually or constructively—about its California [Virginia] user base, and that it exploits that base for commercial gain by selling space on its website for advertisements." *See id.*; *see also uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 428 (7th Cir. 2010) (rejecting the defendant's attempt to "distance itself from Illinois by casting the Illinois market as simply one among many, a place of no particular interest to it"). In this instance, we reject the notion that the relationship between Kurbanov's Websites and their visitors can hardly be labeled commercial.

We also find several other relevant facts, together with those already discussed, suggest that Kurbanov intended to invoke the protections of Virginia and the United States more generally. For instance, Kurbanov registered a Digital Millennium Copyright Act agent with the U.S. Copyright Office, thereby qualifying the Websites for certain safe harbor defenses to copyright infringement claims. Kurbanov has also contracted with U.S.-based advertising brokers, registered his Websites with U.S.-based domain registers, and until recently relied on U.S.-based servers. These facts might not be *individually* sufficient to confer specific personal jurisdiction, but when viewed in the context of other jurisdictionally relevant facts, they contradict Kurbanov's contention that he could not have anticipated being haled into court in Virginia.

In sum, we conclude Kurbanov's contacts with Virginia are quantitatively and qualitatively sufficient to demonstrate that he purposefully availed himself of the privilege of conducting business here.

16

B.

The second prong, whether Appellants' claims arise out of the activities directed at the forum, concerns to what extent Kurbanov's contacts with Virginia form the basis of the suit. *Consulting Eng'g*, 561 F.3d at 278–79 (citations omitted). "The analysis here is generally not complicated. Where activity in the forum state is 'the genesis of [the] dispute,' this prong is easily satisfied." *Tire Eng'g*, 682 F.3d at 303 (citing *CFA Inst.*, 551 F.3d at 295). And Appellants' claims arise out of activities directed at the forum state if "substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim." *See id.* at 295–96.

Here, we find that Appellants' claims arise out of activities directed at Virginia. Kurbanov made two globally accessible websites and Virginia visitors used them for alleged music piracy. In addition, Kurbanov knew the Websites were serving Virginian visitors and yet took no actions to limit or block access, all while profiting from the data harvested from the same visitors. It is hardly surprising, then, that Kurbanov's contacts with Virginia were "substantial and form[ed] a central part of [Appellants'] claims." *See Tire Eng'g*, 682 F.3d at 306.

Kurbanov, not directly addressing this prong, insists that Appellants are improperly attempting to elevate the significance of non-claim related contacts with Virginia. For instance, Kurbanov points to Appellants' focus on the raw number of viewers and other attenuated contractual agreements with U.S.-based businesses. But, contrary to Kurbanov's contention, the Websites' large audience in Virginia for alleged music piracy and the sale of visitors' data to advertising brokers are what gave rise to Appellants'

17

copyright infringement claims. *See Bristol–Myers Squibb Co.*, 137 S. Ct. at 1780 (recognizing there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State'") (citation omitted).

Indeed, this is not a situation where a defendant merely made a website that happens to be accessible in Virginia. *See, e.g.*, *Scottsdale Capital Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 21 (1st Cir. 2018). Rather, Kurbanov actively facilitated the alleged music piracy through a complex web involving Virginia visitors, advertising brokers, advertisers, and location-based advertising. From Virginia visitors, he collected personal data as they visited the Websites. To the advertising brokers, he sold the collected data and advertising spaces on the Websites. For end advertisers, he enabled location-based advertising in order to pique visitors' interest and solicit repeated visits. And through this intricate network, Kurbanov directly profited from a substantial audience of Virginia visitors and cannot now disentangle himself from a web woven by him and forms the basis of Appellants' claims. Thus, we find these facts to adequately establish an "affiliation between [Virginia] and the underlying controversy." *See Bristol–Myers Squibb Co.*, 137 S. Ct. at 1780.

In sum, we conclude Appellants' copyright infringement claims arise out of Kurbanov's activities directed at Virginia.

\* \* \*

As previously discussed, we also find Kurbanov's contacts sufficiently show he purposefully availed himself of the privilege of conducting business in Virginia. Therefore, the exercise of specific personal jurisdiction under Rule 4(k)(1) is appropriate

18

if it is constitutionally reasonable.[9]  We recognize the district court did not perform a reasonability analysis in the first instance, so we cannot address this prong on appeal.  *See Lovelace v. Lee*, 472 F.3d 174, 203 (4th Cir. 2006) (emphasizing that we are "a court of review, not of first view" (internal quotation marks omitted)).  Accordingly, the district court on remand should perform the required reasonability analysis.

IV.

For the foregoing reasons, we reverse the district court's ruling and remand for proceedings consistent with this opinion.

*REVERSED AND REMANDED*

---

[9] Having reached this conclusion, we need not address whether personal jurisdiction is appropriate under Rule 4(k)(2).