**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 21-1721**

―――――――――

DMARCIAN, INC.,

Plaintiff – Appellee,

v.

DMARCIAN EUROPE BV,

Defendant - Appellant.

―――――――――

**No. 21-2005**

―――――――――

DMARCIAN, INC.,

Plaintiff – Appellee,

v.

DMARCIAN EUROPE BV,

Defendant – Appellant.

**No. 22-1728**

DMARCIAN, INC.,

        Plaintiff – Appellee,

v.

DMARCIAN EUROPE BV,

        Defendant – Appellant.

Appeals from United States District Court for the Western District of North Carolina at Asheville.  Martin K. Reidinger, Chief District Judge.  (1:21−cv−00067−MR)

Argued:  December 8, 2022              Decided:  February 14, 2023

Before WILKINSON and HEYTENS, Circuit Judges, and Henry E. HUDSON, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed in part and vacated and remanded in part by published opinion. Judge Wilkinson wrote the opinion, in which Judge Heytens and Senior District Judge Hudson joined.

**ARGUED:**  Samuel B. Hartzell, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Appellant.  Pamela Suzanne Duffy, ELLIS & WINTERS, LLP, Greensboro, North Carolina; David Anthony Dorey, BLANK ROME LLP, Wilmington, Delaware, for Appellee. **ON BRIEF:** Pressly M. Millen, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina, for Appellant.

2

WILKINSON, Circuit Judge:

This is a case of two software companies—dmarcian, Inc. (dInc) and dmarcian Europe BV (dBV)—and a broken business relationship. The original dmarcian, dInc, is a Delaware corporation with headquarters in North Carolina. Its corporate homonym, dBV, is a Dutch entity based in the Netherlands. In 2016, the two companies negotiated an agreement authorizing dBV to sell dInc's software in Europe and Africa. The license was done on a handshake, and the parties now dispute its terms.

After an initially fruitful partnership, disagreements arose in 2019, ultimately prompting two suits by dBV in the Netherlands and the present suit by dInc in the United States. Among other allegations, dInc accuses dBV of directly competing for customers, which prompted dInc to bring claims of copyright and trademark infringement, misappropriation of trade secrets, and tortious interference. The district court exercised personal jurisdiction over dBV and declined to dismiss for *forum non conveniens*. The district court also issued a preliminary injunction limiting dBV's use of dInc's intellectual property. The district court later held dBV in contempt for violating the injunction, and dBV now appeals.

For the reasons set forth herein, we affirm except as to one aspect of the contempt order, which we vacate and remand for further proceedings as to the proper amount of sanctions.

3

I.

A.

dmarcian, Inc. was founded in 2014 by Tim Draegen, a North Carolina resident, to commercialize software that he developed two years earlier. His software, branded as "dmarcian," helps users authenticate incoming emails through the Domain-based Message Authentication Reporting and Conformance (DMARC) protocol. Users can thus guard themselves against malicious senders masquerading as legitimate businesses or individuals in so-called "phishing" attacks. dInc formally registered "dmarcian" as a trademark in 2019 and copyrighted its source code in 2021. dInc has asserted its source code, customer lists, sales leads, and general market intelligence as trade secrets.

Draegen initially promoted his software through a website: dmarcian.com. His efforts caught the eye of Martijn Groeneweg, a Dutch businessman and co-founder of Mailmerk BV—which would later become dmarcian Europe BV. Groeneweg contacted Draegen in 2013 to propose helping market dmarcian in Europe. Although Draegen and Groeneweg did not reach an agreement, they kept in touch.

In mid-2014, Groeneweg informed Draegen that he had registered the web domains, dmarcian.eu and dmarcian.nl, and programmed them to route traffic to dmarcian.com. Their discussions continued for more than a year, until Draegen ultimately travelled to the Netherlands in January 2016 and met with Groeneweg in person. At that time, the two orally negotiated an agreement between dInc and Mailmerk.

Per the 2016 agreement, which was never reduced to writing, Mailmerk was to rebrand as dmarcian Europe BV (dBV), which it did in 2017. Draegen was also given the

4

option to purchase a 50.01% stake in dBV for €1, which he exercised in 2018. In return, dBV received a license to sell dmarcian software in Europe and Africa.

Following the agreement, dInc directed certain sales leads in Europe and Africa to dBV. dInc also provided dBV employees and customers with operational assistance and technical support, in addition to housing, developing, and maintaining the dmarcian source code from its North Carolina office. dInc shared the source code, meanwhile, with dBV engineers in Bulgaria and the Netherlands who made software improvements. dBV engineers also redesigned dInc's website, dmarcian.com, and made Dutch, French, and Spanish versions linking to dmarcian.com. dInc alleges that its website typically attracted hundreds of new customers each month.

Throughout the partnership, dBV and dInc personnel corresponded regularly. The two companies' employees took part in multiple meetings and virtual training sessions hosted by dInc's representatives in North Carolina. Additionally, Draegen traveled at least once each year to meet dBV personnel in Europe, sometimes bringing other dInc employees along with him. Groeneweg, for his part, travelled once to North Carolina in January 2019 to meet with dInc employees.

Tensions arose in late 2019 when dBV asserted ownership of parts of the dmarcian code that had been written by dBV's developers. dInc voiced disagreement, and initial talks between the companies failed to make headway. At one point, dInc briefly cut off dBV's access to dInc's computer systems. In July 2020, Draegen, as dBV's majority owner, called a shareholders' meeting to resolve the ongoing dispute. In response, dBV's minority shareholder—an entity controlled by Groeneweg—filed suit in the Enterprise Court of the

5

Appellate Court of Amsterdam in the Netherlands (Enterprise Chamber), a Dutch court specialized in Dutch corporate governance disputes. In September 2020, the Enterprise Chamber seized control of dBV and ordered an investigation into its management and affairs. The Chamber named a Dutch attorney as dBV's managing director pending the resolution of the investigation.

Following the Chamber's ruling, dInc again briefly suspended dBV's access to dInc's computer systems. After several months, with the companies still at an impasse in negotiations, dInc announced in January 2021 that it would terminate dBV's license the following month. In response, dBV filed for injunctive relief in Rotterdam Court, prompting a hearing two days later. After dInc representatives failed to appear at the hearing, the Rotterdam Court granted the injunction, ordering dInc to restore dBV's access to its servers and maintain dBV's license while the Chamber investigation proceeded.

After the injunction, dInc alleges that dBV continued selling the dmarcian software while restricting dInc's access to certain customers. According to dInc, dBV set up multiple websites with dInc's logo (only adding the word "EUROPE"), the likenesses of dInc employees, and the identities of dInc customers. dBV's websites were "virtually identical" to dInc's website, except for providing dBV's contact information. *dmarcian, Inc. v. dmarcian Eur. BV* (*dmarcian II*), No. 1:21-CV-00067-MR, 2021 WL 2144915, at *5 (W.D.N.C. May 26, 2021). Draegen testified that a link on dBV's website for "the Americas" routed users to the dBV platform. dBV says it only created these websites because dInc had terminated its access to dInc's computer systems.

6

Additionally, dInc accuses dBV of reporting a "data breach" to authorities and customers as a ruse to lure dInc's business to dBV's "safe new platform." *Id.* dInc alleges that at least one company based in the United States, Clarizen, consequently switched from dInc to dBV. dBV counters that it was obligated to report a data breach because dInc had terminated dBV's access to customer data.

From this point forward, dBV allegedly operated bootlegged versions of dInc's website and encroached on dInc's sales territory with dBV's own platform, derived from dInc's intellectual property. In short, dInc and dBV had gone from partners to competitors. These actions prompted the current lawsuit.

B.

On March 12, 2021, dInc filed suit against dBV in the Western District of North Carolina. Two weeks later, dInc filed a motion for a temporary restraining order and a preliminary injunction. The district court denied dInc's motion for a temporary restraining order but reserved ruling on the preliminary injunction "pending further presentation of evidence and briefing by the parties." *dmarcian, Inc. v. dmarcian Eur. BV* (*dmarcian I*), No. 1:21-CV-00067-MR, 2021 WL 1225876, at *4 (W.D.N.C. Mar. 31, 2021).

In April, dInc amended its complaint, claiming breach of contract, copyright infringement under 17 U.S.C. § 101 (Copyright Act), trademark infringement under 15 U.S.C. § 1051 *et seq.* (Lanham Act), defamation, misappropriation of trade secrets under North Carolina General Statute § 66-152 *et seq.* (North Carolina Trade Secrets Protection Act) and under 18 U.S.C. §§ 1836(b), 1839 *et seq.* (Defend Trade Secrets Act), computer trespass, tortious interference, common law trademark infringement, unjust

7

enrichment, and unfair or deceptive business practices. In response, dBV filed a motion to dismiss for lack of personal jurisdiction and *forum non conveniens*.

The district court denied dBV's motion to dismiss and entered a preliminary injunction against it. For the injunction, the district court only addressed dInc's copyright, trademark, trade secrets, and tortious interference claims, which formed the basis of dInc's requested interim relief. The district court found that dInc was likely to succeed on the merits of its claims.

The court fashioned a preliminary injunction prohibiting dBV from carrying out its activities beyond Europe and Africa, taking certain steps to compete directly with dInc, making alterations to the dmarcian software, and using the "dmarcian" trademark without a disclaimer. On this last point, the injunction specified that dBV could not use dInc's trademark "in any manner" unless such use were accompanied by the following disclaimer:

> This trademark is the trademark of dmarcian, Inc. This website is produced and generated and posted by dmarcian Europe BV, which is a different entity from dmarcian, Inc. This trademark is being used at this location without the permission of dmarcian, Inc. and only pursuant to the terms of a court order allowing its temporary use during litigation between dmarcian, Inc. and dmarcian Europe BV.

*dmarcian II*, 2021 WL 2144915, at *27. For websites using the "dmarcian" name, the injunction also required dBV to place the following disclaimer atop each webpage:

> The dmarcian software was originally developed by dmarcian, Inc. This is not the website of dmarcian, Inc. The website of dmarcian, Inc. can be found at https://dmarcian.com.

*Id.*

8

One month later, dInc moved to hold dBV in contempt for violating the preliminary injunction. dBV then moved to stay or modify the injunction. In an August order, the district court found dBV in contempt and partly amended the injunction, while denying dBV's motion to stay. *dmarcian, Inc. v. dmarcian Eur. BV* (*dmarcian III*), No. 1:21-CV-00067-MR, 2021 WL 3561182, at *7 (W.D.N.C. Aug. 11, 2021). Per its finding of contempt, the district court ordered dBV to pay $5,000 "for each day after the entry of the Preliminary Injunction" that dBV used any "website featuring the 'dmarcian' domain name" without the required disclaimer. *dmarcian, Inc. v. dmarcian Eur. BV* (*dmarcian IV*), No. 1:21-CV-00067-MR, 2021 WL 3561183, at *9 (W.D.N.C. Aug. 11, 2021). The total sanction came out to $335,000 after the court found that dBV had violated the preliminary injunction for 67 days.

dBV timely appealed three of the district court's orders—one in May granting the preliminary injunction, and two in August amending the preliminary injunction and holding dBV in contempt. We consolidated these three appeals into the current case.

In all, dBV now raises four issues. First, dBV asserts that dInc failed to establish that the district court had personal jurisdiction over dBV. Second, dBV challenges the district court's decision not to dismiss the case based on *forum non conveniens*. Third, dBV urges us to reverse the preliminary injunction, arguing that dInc is unlikely to succeed on its copyright, trademark, trade secrets, and tortious interference claims. Last, dBV asks that we vacate the civil contempt order.

9

II.

We address "as a preliminary matter" whether the district court lacked personal jurisdiction over dBV. *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). Once the defendant contests personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of demonstrating personal jurisdiction at every stage." *Id.* The district court found that dInc met its burden and accordingly denied dBV's motion to dismiss for lack of personal jurisdiction. We review this ruling de novo, *Eshelman v. Puma Biotechnology, Inc.*, 2 F.4th 276, 280 (4th Cir. 2021), "though the court's factual findings are reviewed for clear error," *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 300 (4th Cir. 2012).

A court "may exercise personal jurisdiction over a foreign corporation only if: (1) such jurisdiction is authorized by the long-arm statute of the state in which the district court sits; and (2) application of the relevant long-arm statute is consistent with the Due Process Clause of the Fourteenth Amendment." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014). Because dInc brought this case in the Western District of North Carolina, we first consider the applicability of North Carolina's long-arm statute before determining whether that application comports with due process.

A.

The district court found two sections of the North Carolina long-arm statute—North Carolina General Statute Sections 1-75.4(4)(a) and (5)(b)—authorize personal jurisdiction over dBV. Under Section 1-75.4(4)(a), courts have jurisdiction "in any action claiming injury to person or property within [North Carolina] arising out of an act or omission

10

outside this State by the defendant, provided in addition that at or about the time of the injury either [s]olicitation or services activities were carried on within this State by or on behalf of the defendant." N.C. Gen. Stat. § 1-75.4(4)(a). For Section 1-75.4(4)(a) to apply, "a plaintiff must establish: 1) an action claiming injury to a North Carolina person or property; 2) that the alleged injury arose from activities by the defendant outside of North Carolina; and 3) that the defendant was engaging in solicitation or services within North Carolina at or about the time of the injury." *Speedway Motorsports Int'l Ltd. v. Bronwen Energy Trading, Ltd.*, 707 S.E.2d 385, 394 (N.C. App. 2011) (internal quotation marks omitted).

Similarly, Section 1-75.4(5)(b) states that courts shall have jurisdiction in any action which "[a]rises out of . . . services actually performed for the defendant by the plaintiff within [North Carolina] if such performance within this State was authorized or ratified by the defendant." N.C. Gen. Stat. § 1-75.4(5)(b). We interpret these provisions with an eye toward the "clear mandate that the North Carolina long-arm statute be given a liberal construction." *Vishay Intertechnology, Inc. v. Delta Int'l Corp.*, 696 F.2d 1062, 1065 (4th Cir. 1982).

The district court was correct to find the relevant provisions of North Carolina's long-arm statute satisfied here. Pertinent to Section 1-75.4(4)(a), dInc is a North Carolina business claiming injury from acts abroad by dBV at the time dInc provided services on behalf of dBV. Specifically, dInc alleged that dBV misused dInc's proprietary information, which constitutes an injury under Section 1-75.4(4)(a). *Fran's Pecans, Inc. v. Greene*, 516 S.E.2d 647, 650 (N.C. App. 1999). Further, dInc claimed that the injury was felt at

11

home due to confusion among its American customers, in part from dBV's "virtually identical" websites. *dmarcian II*, 2021 WL 2144915, at *18.

Last, dInc alleged that it sustained this injury while providing services "on behalf" of dBV essential to their work together. *See Inspirational Network, Inc. v. Combs*, 506 S.E.2d 754, 759 (N.C. App. 1998) (explaining that performing contractual services for defendant in North Carolina "*prima facie* satisfie[s] the requirements of [] § 1-75.4(4)(a)"). North Carolina courts define "services activities" in Section 1-75.4(4)(a) to include visits or calls by a business representative in North Carolina. *See, e.g.*, *Carson v. Brodin*, 585 S.E.2d 491, 495–96 (N.C. App. 2003); *Vision Motor Cars, Inc. v. Valor Motor Co.*, 981 F. Supp. 2d 464, 472 (M.D.N.C. 2013) (collecting cases). On top of Groeneweg's visit to North Carolina in 2019, dInc alleged visits and calls occurred regularly in the form of virtual meetings attended by dBV employees. dInc's claims thus satisfy Section 1-75.4(4)(a).

That's not all. Pertinent to Section 1-75.4(5)(b), dInc "actually performed" services in North Carolina that were "authorized or ratified by" dBV. These services included fielding sales leads in North Carolina and routing certain ones to dBV if they fell within dBV's territory, overseeing the source code repository for both dInc and dBV, and providing dBV with operational assistance, technical support, platform maintenance, and customer support. *dmarcian II*, 2021 WL 2144915, at *6.

These services were ostensibly performed pursuant to the contract of cooperation between the parties, which dInc maintains required joint use of the software and a mutual division of sales in certain regions. dBV accepted these services, as they were essential to

12

the daily operation of dBV's business. *See US Chem. Storage, LLC v. Berto Constr., Inc.*, 800 S.E.2d 716, 719 (N.C. App. 2017) (finding Section 1-75.4(5)(b) satisfied when services were "actually performed" pursuant to business agreement). These services were thus "authorized or ratified" by dBV. dInc's alleged injury, moreover, arose out of the provision of these services. Indeed, dBV only had access to dInc's intellectual property because dInc provided it, along with accompanying services for dBV to market dInc's software overseas up until their business relationship broke down due to dBV's alleged misconduct.

Jurisdiction is thus authorized by Sections 1-75.4(4)(a) and (5)(b) of the North Carolina long-arm statute.

### B.

We next consider whether the "application of the relevant long-arm statute is consistent with the Due Process Clause of the Fourteenth Amendment." *Universal Leather*, 773 F.3d at 558. For a court to assert specific personal jurisdiction, we have synthesized the due process requirements "into a three-prong test: (1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 352 (4th Cir. 2020) (internal quotation marks omitted). We consider each prong in turn.

13

1.

The purposeful-availment prong "is not susceptible to a mechanical application" and requires a court to consider "a list of various nonexclusive factors." *Id.* Those factors include "(1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted." *Id.* (quoting *Sneha Media & Entm't, LLC v. Associated Broad. Co. P. Ltd.*, 911 F.3d 192, 198–99 (4th Cir. 2018)).

Though dBV does not maintain offices or property in North Carolina, and the choice of law factor is unclear, the remaining factors show that dBV purposefully availed itself "of the privilege of conducting business under the laws of the forum state." *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009). A "foreign defendant has purposefully availed itself of the privilege of conducting business in the forum state when the defendant substantially collaborated with a forum resident and that joint enterprise constituted an integral element of the dispute." *Universal Leather*, 773 F.3d at 560 (internal quotation marks omitted). That is precisely what happened here.

To start, it is undisputed that Groeneweg reached into North Carolina to initiate business with Draegen, and that this contact formed the basis for the parties' business

14

relationship. Our court "place[s] special importance on the fact that defendant initiated contact with the plaintiff in the forum state." *Sneha Media & Entm't*, 911 F.3d at 200 (internal quotation marks omitted). dBV downplays this solicitation, arguing that dInc did not yet exist so dBV as an entity did not reach into North Carolina. But such a wooden analysis would betray the "flexible" consideration we have said is needed. *Universal Leather*, 773 F.3d at 560.

The record further demonstrates that dBV engaged in significant, long-term business activities in North Carolina by entering a contract of cooperation with dInc. The district court found that "Groeneweg[] visited North Carolina for a week in 2019 in his capacity as the Defendant's managing director to discuss plans for sales, marketing, deployment, and customer development." *Id.* Moreover, dBV's "employees also regularly attended monthly 'all hands' virtual meetings, and weekly 'department' virtual meetings, which were all led by [dInc's] employees in North Carolina." *Id.* This reveals in-person contact regarding the business relationship. That these interactions were over the Internet makes no difference to the purposeful availment analysis, for jurisdiction can be established when a defendant purposefully, "through electronic contacts, has conceptually 'entered' the State via the Internet for jurisdictional purposes." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 713 (4th Cir. 2002).

Further, the agreement required the performance of duties in North Carolina. The district court found that dBV "performed under that contract for several years by paying compensation into North Carolina, acting on client referrals directed through North

15

Carolina, and accepting operational assistance, technical help, platform maintenance, and customer support from [dInc in] North Carolina." *dmarcian II*, 2021 WL 2144915, at *9.

Finally, the nature, quality, and extent of the parties' communications reveals a robust partnership. The very nature of the agreement necessitated dBV's continuous interaction with dInc in North Carolina; even the way dBV characterizes its relationship with dInc reveals an understanding of cooperation and collaboration. The parties' business relationship relied on sharing information over the Internet between North Carolina and the Netherlands, as dBV admits it was "fully dependent" on the servers controlled by dInc for all of its "market activities" and "customer data." J.A. 596.

We have underscored that courts should consider "the *quality* and *nature* of the defendant's connections, not merely the number of contacts between the defendant and the forum state." *UMG Recordings*, 963 F.3d at 352. Here, rather than "random, fortuitous, or attenuated," the contacts were coordinated, systemic, and purposefully maintained. *Id.* at 351. In sum, dBV "purposefully reached out" by "entering a contractual relationship that envisioned continuing and wide-reaching contacts" in North Carolina. *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (internal quotation marks omitted). dBV thus purposefully availed itself of the protections of North Carolina law.

2.

The second prong of the due process analysis contemplates whether dInc's claims arose out of activities dBV directed at North Carolina. "The analysis here is generally not complicated," if "substantial correspondence and collaboration between the parties, one of which is based in the forum state, forms an important part of the claim." *Tire Eng'g*,

16

682 F.3d at 303. Collaboration exists when there is "an integrated relationship" in which the parties "work jointly on an activity, especially to produce or create something," as opposed to "isolated interaction." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 295–96 (4th Cir. 2009) (internal quotation marks omitted).

dInc's intellectual property claims arose from dBV's North Carolina-directed activities. dInc alleges that dBV misused trademarks that had developed a reputation within North Carolina and that dBV misappropriated copyrighted material and trade secrets, which stem from the shared software jointly developed by dInc and dBV. Indeed, dBV's use of the trademark grew out of its collaboration with dInc, which dBV concedes was necessary to its operations over several years. Here, "substantial . . . collaboration between the parties," working jointly to create something, "forms an important part of [dInc's] claim[s]." *Tire Eng'g*, 682 F.3d at 303. dInc's claims thus arose out of activities dBV directed at North Carolina.

## 3.

The third prong asks whether the assertion of personal jurisdiction over the defendant is constitutionally reasonable. This prong "permits a court to consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there." *Consulting Eng'rs Corp.*, 561 F.3d at 279. This final prong considers factors such as the burden on the defendant, the court's ability to conveniently and efficiently resolve the dispute, the interest of the forum state in adjudicating the dispute, the plaintiff's interest in obtaining effective relief, and the interests of the state in furthering substantive policies. *Id.*

17

The reasonableness inquiry makes sure that "litigation is not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." *CFA Inst.*, 551 F.3d at 296 (internal quotation marks omitted). Importantly, a "corporate defendant's domicile abroad, standing alone, does not render domestic exercise of jurisdiction unduly burdensome." *Tire Eng'g*, 682 F.3d at 303.

The third prong is met here for multiple reasons. First, dBV entered into a business relationship with a company based in North Carolina and incorporated in Delaware, making it foreseeable that it would be called into United States court. The "inequity of being haled into a foreign forum is mitigated if it was reasonably foreseeable that the defendant could be subject to suit there." *CFA Inst.*, 551 F.3d at 296. What's more, dBV offered Draegen the option of becoming its majority shareholder. If one reason for ensuring the foreign corporation has minimum contacts with the forum state is to prevent it from being dragged into court where it "did not anticipate being sued," *UMG Recordings*, 963 F.3d at 351, then dBV cannot argue surprise here. It was foreseeable that a dispute with dInc, its licensor, or Draegen, its majority shareholder, could end up in federal court in North Carolina.

Second, and equally important, both North Carolina and dInc have strong interests in protecting intellectual property rights. North Carolina has a "manifest interest" in offering remedies to its wronged businesses. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985). Likewise, dInc has a "substantial interest" in protecting its intellectual property after having "carved out a market niche by cultivating" anti-phishing software through considerable time and resources. *Tire Eng'g*, 682 F.3d at 303. dInc's interest is

18

especially strong because it is a software company whose primary product is email security. dInc's brand is built on trust, so it was understandably sensitive to misuse of its trademark, design, and other branding instruments. dInc's and North Carolina's interests are, therefore, mutually reinforcing. North Carolina has a strong interest in protecting its companies' rights from foreign infringements, and North Carolina companies like dInc maintain a strong interest in relying on their home forum for vindication of their legitimate rights. The relevant factors here demonstrate that the assertion of personal jurisdiction over dBV is constitutionally reasonable.

The district court's assertion of personal jurisdiction over dBV thus abided by North Carolina's long-arm statute and comported with due process. We therefore affirm the district court on this issue.

### III.

We next consider the issue of *forum non conveniens*. dBV moved to dismiss the case based on *forum non conveniens* below, asserting that Dutch courts provide an available and adequate forum, but the district court declined to oblige. We review the district court's decision for abuse of discretion. *Galustian v. Peter*, 591 F.3d 724, 731 (4th Cir. 2010). Sitting in review, we must remember that the "*forum non conveniens* determination is committed to the sound discretion of the trial court." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981). Accordingly, absent a "clear abuse of discretion," the district court's "decision deserves substantial deference." *Id.*

The Supreme Court has established a three-part framework for *forum non conveniens* in which the moving party must show that an "alternative forum is: 1) available;

19

2) adequate; and 3) more convenient in light of the public and private interests involved." *Jiali Tang v. Synutra Int'l, Inc.*, 656 F.3d 242, 248 (4th Cir. 2011) (citing *Piper Aircraft*, 454 U.S. at 241). "Availability will ordinarily be satisfied when the defendant is amenable to process in the other jurisdiction." *Id.* at 249 (internal quotation marks omitted). A foreign forum is "adequate" when "all parties can come within that forum's jurisdiction" and "the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court." *Id.* (internal quotation marks omitted). Yet "where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative." *Piper Aircraft*, 454 U.S. at 254 n.22.

The district court found here that dBV failed to propose an adequate alternative forum because its proffered forum in the Netherlands could not adjudicate trademark claims arising under United States law. The district court further stated that even if the Dutch court were an adequate and available forum, the "private and public interests to be weighed in considering a *forum non conveniens* motion also weigh against" dBV. *dmarcian II*, 2021 WL 2144915, at *12. We see no abuse of discretion in this holding.

The district court was correct to conclude that the Dutch court's inability to effectively adjudicate American trademark law claims disqualified it as an adequate forum. Dutch courts have at most a limited ability to adjudicate and enforce violations of American trademark law resulting in injuries to American trademark holders within the United States. "The concept of territoriality is basic to trademark law," meaning that "trademark rights exist in each country solely according to that country's statutory scheme." *Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617, 628 (4th Cir. 2003)

20

(internal quotation marks omitted). Under established trademark doctrine, therefore, Dutch courts could only offer empty remedies that American courts are not "bound to recognize." *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1531 (11th Cir. 1985); *George W. Luft Co. v. Zande Cosm. Co.*, 142 F.2d 536, 539 (2d Cir. 1944).

dInc seeks to litigate trademark infringement claims that the Dutch court could not effectively adjudicate, for the Dutch ruling would carry little force in the United States. *See Otokoyama Co. v. Wine of Japan Imp., Inc.*, 175 F.3d 266, 272 (2d Cir. 1999) (explaining that a claimant's rights or lack of rights "to a trademark in the United States cannot be established by" the rulings of a "foreign court"). As the district court observed, dBV failed to show that Dutch courts have jurisdiction to address dInc's trademark infringement claim, and "the Dutch courts have abstained from addressing [dInc's] intellectual property claims that are asserted in this action." *dmarcian II*, 2021 WL 2144915, at *12 n.14.

Without the ability to offer dInc a remedy that would "traverse international borders," the Dutch courts could not provide relief even if dInc proved itself wronged. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 714 (3d Cir. 2004); *see also Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir. 1956) (explaining the general principle that "the decisions of foreign courts concerning the respective trade-mark rights of the parties are irrelevant and inadmissible" in "American court"). That Dutch courts could at most offer dInc a remedy in name only cuts sharply against labeling the Dutch court an adequate forum because there is a "danger that [dInc] will be deprived of any remedy" regarding its trademark claims. *Piper Aircraft*, 454 U.S. at 255.

21

Unavailability of a certain remedy is proper grounds for rejecting a *forum non conveniens* motion. *Galustian*, 591 F.3d at 732. For example, when a foreign court provided no civil cause of action for defamation, we deemed that foreign court was not shown to be adequate. *Id.* We reached the same conclusion when a foreign court provided no cause of action for wrongful arrest. *Fid. Bank PLC v. N. Fox Shipping N.V.*, 242 F. App'x 84, 92–93 (4th Cir. 2007).

The lack of a remedy for certain intellectual property claims proves fatal to the adequacy of the alternative forum. Other circuits share this understanding. The Federal Circuit has explained that it is "particularly important that a *forum non conveniens* movant demonstrate the adequacy of an alternative forum when the dispute implicates the enforcement of intellectual property rights." *Halo Creative & Design Ltd. v. Comptoir Des Indes Inc.*, 816 F.3d 1366, 1373 (Fed. Cir. 2016). Without an adequate forum to vindicate U.S. copyright, patent, and trademark rights, the laws protecting such rights would prove feeble. That is why district courts have "routinely" found alternative foreign forums inadequate "when United States intellectual property rights form the crux of the dispute." *Id.*; *see also Lang Van, Inc. v. VNG Corp.*, 40 F.4th 1034, 1043 (9th Cir. 2022) (quoting same language).

dBV has thus failed to carry its burden of showing an adequate and available alternative forum. Only if the alternative forum is both available and adequate must a court then weigh a list of public and private interest factors. Because we hold that the district court did not abuse its discretion in finding that dBV failed to show an adequate alternative

22

forum, we need not reach the private and public interest factors. We affirm the district court's denial of dBV's motion to dismiss on *forum non conveniens* grounds.

The larger story here is that of a trans-Atlantic business relationship of no small duration where contacts were regularly traded back and forth between North Carolina and the Netherlands. For all the reasons noted above, we perceive no offense to law or justice for North Carolina federal court to serve as the forum for resolution of the case at bar.

## IV.

We now turn to dBV's challenge of the May 2021 preliminary injunction. We review the district court's injunction for abuse of discretion, *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013), examining all factual findings for clear error and legal conclusions de novo, *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021). Though an "extraordinary remedy," a preliminary injunction is warranted where the plaintiff has established "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008). dBV raises a challenge only to dInc's likelihood of success on the merits.

The district court issued a preliminary injunction as to dInc's copyright, trademark, trade secret, and tortious interference claims. At issue on appeal is the district court's conclusion that dInc had a likelihood of prevailing on the merits of these claims. dBV raises two main arguments. First, dBV contends that the district court impermissibly applied United States and North Carolina law extraterritorially, thus running afoul of the

23

presumption against extraterritoriality, which establishes that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016). Second, dBV maintains that the district court's decision was premature in light of pending litigation in the Netherlands.

Neither argument proves availing. The relevant laws all concern dBV's conduct, which notably touched *American* customers. And the ongoing Dutch case did not preclude the district court's injunction, because no conceivable construction of dBV's 2016 license would have authorized its actions on a global scale.

A.

dBV contests whether dInc is likely to succeed on its copyright, trademark, trade secrets, and tortious interference claims. We consider each claim in turn.

1.

Under the Copyright Act, "[a]nyone who violates any of the exclusive rights of the copyright owner . . . is an infringer." 17 U.S.C. § 501(a). To establish copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of [his] work that are original." *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (internal quotation marks omitted). Because the Copyright Act has limited application abroad, a plaintiff must also show a "domestic violation." *Tire Eng'g*, 682 F.3d at 308. The district court determined that dInc would likely prevail on its copyright claim, and we agree.

24

First, dInc presented the district court with a copyright—registered in early 2021—of its 2012 source code. dBV attempts, for the first time in its reply brief, to cast doubt on the copyright's validity because dInc deposited an updated version of the 2012 source code with the Copyright Office. This belated claim is unpersuasive. The law establishes a presumption of validity for copyrights registered within five years of their first use. 17 U.S.C. § 410(c); *see, e.g.*, *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 434 (4th Cir. 1986). Even after that time, registration can still have probative value subject to the "discretion of the court." 17 U.S.C. § 410(c); *see, e.g.*, *Silvertop Assocs. Inc. v. Kangaroo Mfg. Inc.*, 931 F.3d 215, 219 n.3 (3d Cir. 2019). The district court here found dInc's copyright to be valid. We do not find in the record the kind of evidence to overturn the district court on this point or to upset dInc's contention that any differences between the 2012 and 2021 versions of the source code were immaterial and, accordingly, unlikely to "jeopardize the validity of the registration." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1161 (1st Cir. 1994).

Second, the district court reasonably found that dBV had reproduced elements of dInc's copyrighted source code outside the parameters of the 2016 agreement. We have previously held that a "licensee infringes the owner's copyright if its use exceeds the scope of its license." *Tattoo Art Inc. v. TAT Int'l LLC*, 498 F. App'x 341, 346 (4th Cir. 2012). Other circuits agree. *See, e.g., S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1087 (9th Cir. 1989); *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 n.8 (7th Cir. 1996). dBV admitted that the 2016 agreement permitted it to sell dInc's software in Europe and Africa. dBV likely went beyond the "scope" of its license by marketing its services to customers outside of Europe

25

and Africa, thus encroaching on dInc's sales territory. In particular, there can be no reasonable contention that dBV's license extended to the ability to use dInc's own software to compete for dInc's own customers in the United States. dBV's efforts even led to onboarding a California-based company called Clarizen. In short, dBV marketed "copies" of dInc's "copyrighted work" in the United States without authorization. *CoStar*, 373 F.3d at 549. What was by all evidence intended as a cooperative agreement, encompassing the allocation of distinct sales territories, has been implausibly transformed before this court into something akin to a suicide note signed by dInc for the serious impairment of its business.

Finally, the district court correctly determined that dBV committed a "domestic violation." As the district court explained, dBV was "servicing American customers who merely have offices and operations in Europe and elsewhere." *dmarcian II*, 2021 WL 2144915, at *17. This entailed the "using, copying, selling, and distributing" of dInc's copyrighted source code without authorization. *Id.* That dBV performed these acts from abroad is of no import. For a defendant who "directs infringing [material] into the United States from abroad commits a domestic violation of the Copyright Act." *Spanski Enterprises, Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 916 (D.C. Cir. 2018).

dBV argues that the district court failed to identify an instance of infringement definitively involving a United States *natural person*. But dBV cites no authority for the proposition that United States *entities* do not count for purposes of the extraterritoriality analysis. dBV specifically contends that it only interacted, for example, with an Israeli citizen when it communicated with Clarizen. The fact remains, however, that Clarizen, a

26

company whose principal place of business is California, remained an American company and customer of dInc, no matter the nationality of its individual employees. Decoupling the worker from the firm runs counter to the long-held premise that a "corporation will generally act by its agents." *Bank of U.S. v. Dandridge*, 25 U.S. 64, 92 (1827).

Moreover, there is little reason to think that a United States headquarters would be impervious to copyright infringement originating in a European division. Corporations are not informational hermits; employees talk across departments. That dBV circulated copyrighted materials to the international employees of American companies makes it probable that at least some domestic colleague would have also received them. dBV does not specify any firewall or device that would have stopped such transfers. In sum, we do not think that the district court erred in finding that domestic violations occurred for purposes of extraterritorial application of the Copyright Act.

## 2.

The district court likewise ruled that dInc was likely to succeed on a claim of trademark infringement under the Lanham Act, which protects the "owner's exclusive right to use [a] registered mark in commerce." 15 U.S.C. § 1057(b). dInc's claim required establishing both (1) a valid mark and (2) the "likelihood of confusion" due to another mark in the marketplace. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990).

dInc is likely to succeed on its Lanham Act claim. dBV does not contest that dInc holds a valid trademark, registered as of 2019. And the similarity of the parties' marks has likely caused confusion in the email-security marketplace. As the district court explained, the two parties share similar domain names, "virtually identical" website designs, and

27

"essentially the same" business services. *dmarcian II*, 2021 WL 2144915, at \*18. What's more, dInc supplied evidence of "actual confusion" in the form of "several exhibits showing consumers that have contacted the parties or posted on the internet after becoming confused about the relationship between" dInc and dBV. *Id.* While dBV disputes whether those customers were genuinely confused, the lodestar for a trademark-infringement claim is "likelihood of confusion," not "actual confusion." *George & Co. LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009). It is all too predictable that homonymous companies selling the same software on nearly identical websites would spawn confusion. dInc has thus demonstrated a likelihood of prevailing on its Lanham Act claim.

dBV again contests what it alleges is an extraterritorial application of this statute. While the Lanham Act has limited reach abroad, the district court correctly applied the three factors from *Steele v. Bulova Watch Co.*, 344 U.S. 280, 286 (1952), in rebutting the presumption against extraterritoriality. Those factors are whether (1) the defendant's extraterritorial conduct had a "significant effect on United States commerce"; (2) "the defendant was a citizen of the United States;" and (3) an injunction "would not interfere with the sovereignty of the nation within whose borders the extraterritorial conduct was to be prohibited." *Nintendo of Am., Inc. v. Aeropower Co.*, 34 F.3d 246, 250 (4th Cir. 1994). dBV chiefly contests the first factor on appeal.

As to the first factor, the district court found that dBV's websites provided an option for "the Americas," that at least one American company (Clarizen) had switched to dBV's platform, and that dBV had messaged American customers about a purported data breach. As mentioned, the district court also highlighted evidence of customers' confusion and the

28

similarity of the parties' domain names. On these findings, the district court had ample grounds to conclude that dInc would likely show a "significant effect on United States commerce." *dmarcian II*, 2021 WL 2144915, at *19.

dBV again counters that dInc did not identify *natural persons* in the United States who were confused. But as in the copyright context, dBV does not explain why the "significant effect" inquiry cannot be satisfied by American *companies*, nor why confusion among employees in a European division would not spread to United States headquarters. Furthermore, the evidence that dBV's mark caused confusion among customers abroad indicates that United States customers were likely confused too. At bottom, it was not error for the district court to reason that dInc would prevail on its Lanham Act claim.

3.

The district court also found that dInc would likely succeed on a misappropriation claim under the Defend Trade Secrets Act (DTSA). The DTSA allows an "owner of a trade secret that is misappropriated [to] bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). To prevail on such a claim, a plaintiff must accordingly establish (1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicates interstate or foreign commerce. *Oakwood Labs. LLC v. Thanoo*, 999 F.3d 892, 905 (3d Cir. 2021).

Relevant here, the DTSA defines a trade secret as "financial, business, scientific, technical, economic, or engineering information, including . . . programs[] or codes," where the "owner thereof has taken reasonable measures to keep such information secret[,]"

29

and the information derives independent economic value . . . from not being generally known." 18 U.S.C. § 1839(3).

As the district court observed, dInc's "source code," "customer database," and business accounts are all likely trade secrets. *dmarcian II*, 2021 WL 2144915, at *21. dInc has taken steps to keep such information secret through security measures restricting access to the source code and requiring confidentiality agreements from employees. The relevant information holds economic value, moreover, by not being generally known. For instance, if other email-security companies knew the source code, they could reverse engineer dInc's software and entice customers with a competing product. Likewise, if dInc's list of sales leads was generally known, the value of that list would decline as its members become inundated with rival offers.

Furthermore, the district court found that dBV had misappropriated dInc's trade secrets by using them to compete with dInc. Such conduct by dBV would have exceeded "the scope of the parties' agreement." *Id.* And finally, there is little question that dBV deployed the trade secrets in foreign commerce. We accordingly agree with the district court the dInc would likely satisfy the elements of the DTSA.

Though dBV once again invokes the presumption against extraterritoriality, the district court was careful to assess whether "an act in furtherance of the offense" took place in the United States, as the DTSA requires. 18 U.S.C. § 1837(2). The district court noted the "relatively low bar" for this requirement: "courts place less import on the scope of the actions committed within the United States than the tie between those actions and the misappropriation." *dmarcian II*, 2021 WL 2144915, at *22. In this light, the district court

30

correctly concluded that two of dBV's "acts" in the United States would qualify: First, dBV had "originally gained access" to dInc's trade secrets through "data stored on servers within the United States"; and second, dBV had likely facilitated the trade secrets' "use or disclosure . . . within the United States." *Id.*

While dBV insists that it only received the alleged trade secrets "under an agreement reached in the Netherlands," Appellant Br. at 53, this sidesteps the district court's point. dInc only needed to show that "an act" occurred in the United States, not the entire "offense." 18 U.S.C. § 1837(2). That dBV retrieved the trade secrets from dInc's North Carolina servers is enough for establishing a domestic nexus. Additionally, while dBV again objects to the district court's treatment of American companies as being "within the United States," we remain unmoved for the reasons discussed in the copyright and trademark contexts. An employee's nationality does not negate the status of his employer. At bottom, the district court did not err in concluding that dInc would likely show dBV had misappropriated trade secrets under the DTSA.

4.

Finally, the district ruled that dInc would likely succeed on two state-law claims: tortious interference with contract and tortious interference with prospective economic advantage. Because these torts can potentially interfere with healthy commercial competition, North Carolina has been careful to cabin them. Under North Carolina law, the first claim (tortious interference with contract) requires demonstrating (1) a valid contract between the plaintiff and a third person; (2) the defendant's knowledge of the contract; (3) that the defendant intentionally induced the third person not to perform the contract;

31

(4) that the defendant acted without justification; and (5) that the plaintiff suffered actual damage. *Intersal, Inc. v. Hamilton*, 834 S.E.2d 404, 413 (N.C. 2019). The second claim (tortious interference with prospective economic advantage) requires showing a defendant "maliciously induc[ed] a person not to enter into a contract with [the plaintiff], which he would have entered into but for the interference, if damage proximately ensues, when this interference is done not in the legitimate exercise of the [defendant's] rights." *Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC*, 784 S.E.2d 457, 463 (N.C. 2016) (internal quotation marks omitted).

As to the first claim, the district court found evidence that dBV had lured Clarizen, "one of [dInc's] U.S. customers" away from dInc over to dBV. *dmarcian II*, 2021 WL 2144915, at *23. Based on that example, the district court did not err in determining that dInc would prevail on the elements of a tortious interference claim. The district court could fairly have concluded that dInc had a valid contract with Clarizen, of which dBV was aware, and with which dBV interfered without justification, thereby harming dInc's business. Indeed, the record indicates that dBV won over Clarizen after announcing a purported data breach and then advertising its "safe new platform" to dInc clients. *Id.* at *5. While further discovery could reveal other such incidents, the Clarizen example is enough for dInc to show a likelihood of success at the present stage.

For dInc's second claim, the district court found that dInc could show that a "contract would have ensued but for [dBV's] interference." *Beck v. City of Durham*, 573 S.E.2d 183, 191 (N.C. App. 2002). Because dInc's website was a prolific acquisition channel, allegedly generating hundreds of new customers each month, the district court

32

reasonably surmised that dBV's "misleadingly similar" websites had siphoned off would-be customers from dInc. *dmarcian II*, 2021 WL 2144915, at *24.

dBV argues that North Carolina law does not extend to it, because dBV "never entered into, or interfered with, any contract between dInc and any person . . . in the United States." Appellant Br. at 54. Here the injury was not only to an American company but specifically to a North Carolina company as well. As discussed in the copyright, trademark, and trade secrets contexts, dBV *did* market to United States customers by targeting overseas offices of American companies, including Clarizen. While dBV may have only corresponded with foreign employees, the American companies themselves—and not their employees—would presumably have assumed the obligations of any contract with dBV. Furthermore, dInc alleged that dBV websites sent users clicking on "the Americas" to dBV's own platform. Moreover, the ultimate harm from the alleged tortious interference fell on a North Carolina entity. We thus disagree that North Carolina law cannot reach dBV.

The district court did not err in concluding, based on the available evidence, that dInc was likely to prevail on its copyright, trademark, trade secret, and tortious interference claims. dBV does not challenge the district court's analysis of the remaining three elements of the preliminary injunction: dInc's likelihood of irreparable harm, the balance of equities, and the public interest. For these elements, we shall thus affirm the district court.

## B.

We must consider one last objection regarding the preliminary injunction. dBV contends that the district court abused its discretion by issuing the preliminary injunction

33

before the Rotterdam Court had clarified the status of the parties' 2016 agreement. In dBV's telling, "all dInc's claims" rest on the flawed premise that dInc had rightfully terminated the 2016 agreement between the parties. Appellant Br. at 43.

We are not so persuaded. Whether or not the agreement had been terminated, dBV's conduct still reflects a violation of the statutes discussed at some length above. In other words, it matters not whether the agreement was still in place. The district court did not abuse its discretion in concluding, at this preliminary stage, that the license would not plausibly account for a record of full-rigged piracy. Of course dBV had every incentive to get the permissive license that it sought in writing, for dBV admitted its position would be "hugely improved" if the agreement were in the record. Oral Arg. at 49:26. Its case is substantially weakened by the fact that the agreement dBV sought is nowhere in the record. The absence of a memorialized agreement or even a plausible reading of a non-memorialized understanding, paired with the narrow tailoring of the district court's injunctive decree, reconcile us to the district court's view.

To begin with, the district court understandably rejected dBV's self-portrayal as "merely continuing to perform the agreement." Appellant Reply Br. at 13. The district court repeatedly described conduct by dBV, following the Dutch court's ruling in February 2021, that conformed neither to the parties' prior course of dealings nor any plausible construction of the 2016 license. For example, the district court found that dBV "broke completely free from [dInc's] platform and operations and terminated [dInc's] access to certain customer information." *dmarcian II*, 2021 WL 2144915, at *5. The district court also determined that dBV had reported an ostensible data breach "to every customer [of

34

the parties], including those located within the United States," and messaged existing dInc clients about dBV's "safe new platform." *Id.* at *5, *19. The district court emphasized, moreover, evidence that dBV had begun to "conduct business with customers in the United States, including a California company named Clarizen," and that dBV's websites routed users clicking on "the Americas" to its own platform. *Id.* at *22.

These findings would hardly be less damaging to dBV whether or not the 2016 agreement remained in place. That license may well have given dBV the right to operate under the "dmarcian" name within a certain geographic footprint. But it is difficult to conceive of any license authorizing dBV to compete head-on with dInc, including in the United States, while acting as dInc's corporate doppelgänger. The district court also found no precedent for dBV's competitive behavior in the parties' dealings before February 2021. *See dmarcian II*, 2021 WL 2144915, at *3–5. Even dBV's co-founder, Groeneweg, did not suggest that the 2016 license had teed off a worldwide fight to the finish. Rather he articulated the license as assigning dBV a narrower—and more plausible—right to "exclusively sell to and handle all customers from Russia, Europe and Africa." J.A. 786.

"Common sense," in the words of a sister circuit, "is as much a part of contract interpretation as is the dictionary or the arsenal of canons." *Fishman v. LaSalle Nat. Bank*, 247 F.3d 300, 302 (1st Cir. 2001). Although the agreement in the present case was never written down, the district court did not err in combining law with logic. Whatever the license's precise contours, it makes little sense that dInc would have given away the store— source code, client lists, and trademark—to a first-time partner who would then utilize dInc's entire shelf of intellectual properties to put dInc out of business.

If dInc had so exposed itself, moreover, we note, once again, that dBV would likely have at least insisted on memorializing the agreement in some way. The glaring absence of a written agreement in the record suggests, however, that dBV did not. Whether or not the purported agreement is ultimately found to run afoul of a statute of frauds, it is a tall order to ask courts to blindly accept the alleged contents of an oral contract of this magnitude. As a sophisticated business party, dBV should have known better than to expect courts to accept its questionable methods or take it at its facially dubious word. All told, without a license in writing to point to and given the sensible conclusion that dInc would not have connived with dBV to effectuate dInc's own demise, the district court's decision seems soundly based.

Furthermore, the district court is "better positioned than we are to weigh the costs and benefits of injunctive relief," *Lord & Taylor, LLC v. White Flint, L.P.*, 780 F.3d 211, 217 (4th Cir. 2015), and its decree here reflected "the necessities of the particular case," *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). The district court did not assume any one resolution to the Netherlands litigation. Instead, it simply barred dBV from using dInc's intellectual property outside any conceivable limits of the 2016 license, pending conclusion of the United States litigation. The injunctive decree thus ordered dBV to confine its activities to Europe and Africa (Paragraphs 1–2), not take certain steps to compete directly with dInc (Paragraphs 6–7), and disclaim the nature of its relationship to dInc should it wish to continue using dInc's trademark (Paragraphs 4–5). The decree's remaining provision instructed dBV to make no further alterations to the dmarcian software (Paragraph 3). Nowhere did the decree forbid dBV from servicing customers in Europe

36

and Africa, nor from dressing itself in dInc's mark on those continents if accompanied by the disclaimer. The preliminary injunction also did not compel dBV to negotiate a new license or pay a licensing fee.

Altogether, the district court fashioned a narrow injunction independently of the outcome of the Dutch case. We hold that the district court was within its discretion to do so. The interim equitable relief here in fact bore aspects of a sensible protective order. As noted above, the Dutch courts are limited in the ability to enforce violations of American trademarks. Had the district court failed to act in the face of the above facts, dInc's entire store of intellectual property rights, the company's very core, would have been left defenseless against what the trial court not unreasonably perceived to be a continuing piracy.

A note of caution, however, is still in order. We note that while the district court's preliminary injunction was a final order for purposes of appeal, it is not final for resolution of the merits of this particular complex international controversy and not impervious to modification or adjustment in the event the trial court determines future evidence or judicial rulings so warrant. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasizing that the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties" pending a final decision on the merits); *see also Jonibach Mgmt. Tr. v. Wartburg Enterprises, Inc.*, 750 F.3d 486, 491 (5th Cir. 2014) (same in the context of an international business dispute).

V.

dBV's remaining challenge concerns the district court's contempt order, which we review for abuse of discretion. *Fed. Trade Comm'n v. Pukke*, 53 F.4th 80, 101 (4th Cir. 2022). Since the contempt order was based on the district court's preliminary injunction, "our review is even more deferential because district courts are in the best position to interpret their own orders." *JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.*, 359 F.3d 699, 705 (4th Cir. 2004).

To establish civil contempt, the moving party must show by clear and convincing evidence "(1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge; (2) that the decree was in the movant's favor; (3) that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and (4) that the movant suffered harm as a result." *Pukke*, 53 F.4th at 101 (internal quotation marks omitted).

The district court's analysis here was straightforward: dBV had knowledge of the injunctive decree against it from the district court's May 2021 order; this decree benefited dInc by seeking to prevent dBV's misuse of dInc's intellectual property; dBV knowingly violated the decree by failing to make required disclaimers when utilizing the "dmarcian" trademark; and as a result, dInc suffered the presumptive harm of consumer confusion. *dmarcian IV*, 2021 WL 3561183, at *7–8.

dBV contends that the district court erred in finding that it had contemptuously violated the May 2021 preliminary injunction. Specifically, dBV argues that it understood its use of the trademark "dmarcian" in domain names—such as dmarcian.nl, dmarcian.es,

38

and dmarcian.eu—to comply with the injunctive decree. Yet Paragraph 4 of that decree instructed dBV to cease using dInc's trademark "in any manner" without an accompanying disclaimer. *dmarcian II*, 2021 WL 2144915, at *27. The words "in any manner" did not invite dBV to fashion an exception for domain names. While dBV protests that the disclaimer would not fit onto a domain name, the district court was best positioned to interpret its own order. It acted well within its discretion to conclude that dBV's argument was "disingenuously technical," and that dBV had made "no good faith attempt to comply." *dmarcian IV*, 2021 WL 3561183, at *7. As the district court pointed out, dBV could have at least added the disclaimer on each website's landing page or moved the court to clarify Paragraph 4's applicability. *Id.* And while dBV objects that customers would not have been confused by the domain name alone, we find that the district court sensibly reasoned that users on "dmarcian.es," for instance, would think they were accessing a dInc website.

Although we find the district court did not abuse its discretion by holding dBV in contempt of its preliminary injunction, we perceive greater merit in dBV's arguments as to the amount of the resulting sanction. A civil contempt sanction must serve either to (1) "coerce obedience to a court order," or (2) "compensate the complainant for losses sustained as a result of the contumacy." *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 821 (4th Cir. 2004) (internal quotation marks omitted). The $5,000-per-day sanction here only pertained to dBV's previous conduct and hence did "not coerce any compliance." *In re Magwood*, 785 F.2d 1077, 1082 (D.C. Cir. 1986). As a result, the sanction—which ultimately summed to $335,000 for 67 days of violative conduct—can only be justified as compensatory. But the district court did not sufficiently specify how its $5,000-per-day

formula approximated "losses incurred" to dInc. *Buffington v. Baltimore Cnty., Md.*, 913 F.2d 113, 134 (4th Cir. 1990). The district court only generally alluded to the parties' total "volume of business" in explaining the formula. *dmarcian IV*, 2021 WL 3561183, at *9.

While measuring the harm from trademark confusion can be a difficult enterprise, it remains the district court's responsibility to ensure the sanction amount is "tailored to compensate the complaining party." *Buffington*, 913 F.2d at 134. Otherwise, the line between civil and criminal contempt, or "the boundary from compensation to punishment," is blurred. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 108 (2017).

dInc's attempts here to justify the district court's sanction fall short. That $5,000 represents roughly half of dBV's daily income does not explain why that amount is "rationally related" to the harm dealt to dInc. Oral Arg. at 40:34. Likewise, the fact that the aggregate sanction of $335,000 is within the range for statutory damages under the Lanham Act does not illuminate how the district court arrived at the $5,000-per-day formula, nor relate to the losses sustained by dInc from dBV's violation of the injunctive decree.

In sum, although we are sympathetic to the challenges of quantifying trademark harm, we simply hold that more was needed from the district court to ground the amount of sanctions imposed here. In so doing, we express no view on the correctness of the amount in dispute on this appeal. We thus reverse the parts of its orders referring to a specific amount of sanctions, and remand for further analysis and calculation on this point.

VI.

International business relationships will often involve uncertainty regarding foreign law and foreign courts. Contracts will not always be perfectly clear, choice of law instructions may not always be precisely set forth, and the parties themselves might not be fluent in foreign statutes. American judges must therefore be sensitive to unanticipated contingencies that can arise in any transnational business relationship. These relationships will inevitably implicate the legitimate interests of foreign nations, businesses, and ordinary citizens, making it vital that jurists across the globe respect "the laws of one nation within the territories of another." J. Story, Commentaries on the Conflict of Laws § 38 (1834). This principle of comity "contributes [] largely to promote justice between individuals, and to produce a friendly intercourse between the sovereignties to which they belong." *Hilton v. Guyot*, 159 U.S. 113, 165 (1895) (internal quotation marks omitted). If American judges trample on or overlook the laws and sovereign claims of other countries, we inevitably invite retaliation against American companies and fuel an inhospitable climate for American businesses seeking to expand their markets and enterprises abroad. We therefore must not neglect the "systemic value of reciprocal tolerance and goodwill" fostered by respect for foreign courts. *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 555 (1987) (Blackmun, J., concurring).

There is, as so often the case with law, another side. When American companies extend their reach or, as here, partner with corporations from abroad, they often put their intellectual property on the line. Their overtures can entail sharing sensitive proprietary information, rendering vital resources vulnerable to unscrupulous actors. And if others

41

abuse their access to valuable information, American businesses stand to lose if they have no effective recourse to legal protection. The outcome of this unfortunate scenario is foreseeable—if left to fend for themselves, businesses will evade the risks of global commerce, foregoing innovation and growth overseas for safety and security at home.

American courts of law are meant to offer, not home cooking, but at least a degree of refuge from this danger. United States companies should feel confident that the courthouse door is open to them when their intellectual property is misused by foreign corporations. That is why statute after statute contemplates at least some foreign conduct. *See, e.g.*, *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2138–39 (2018) (Patent Act); *Bulova Watch Co.*, 344 U.S. at 286 (Lanham Act); *Spanski Enterprises*, 883 F.3d at 914 (Copyright Act); *Amyndas Pharms., S.A. v. Zealand Pharma A/S*, 48 F.4th 18, 35 (1st Cir. 2022) (Defend Trade Secrets Act). Only if businesses believe their valued intellectual property rights can be vindicated will they trust that they can safely engage in commerce beyond our borders.

Cases like the current one will involve a balance. "Due regard" is owed "both to international duty and convenience, and to the rights of [a country's] own citizen." *Hilton*, 159 U.S. at 164. We largely affirm the district court because, as part of that balance, its preliminary injunction protected in a narrow fashion unquestioned intellectual property interests from infringement by questionable means. To leave the intellectual properties of dInc wholly without protection during the pendency of long-running litigation would be to ignore the rights discussed above and the good work and perspective brought by the district court to this case.

The district court did not err in exercising personal jurisdiction, in declining to dismiss for *forum non conveniens*, and in issuing a preliminary injunction. The district court was also justified in issuing a contempt sanction; we simply require a more thorough examination of the sanction amount. While the preliminary injunction may not be the final word on the merits of this internationally entwined case, its entry was also not an abuse of discretion considering the weighty interests and detailed findings discussed at length above. The judgment of the district court regarding personal jurisdiction, *forum non conveniens*, and the preliminary injunction is therefore affirmed. Its judgment as to the contempt sanction amount is vacated and remanded for further proceedings consistent with this opinion.

*AFFIRMED IN PART AND VACATED AND REMANDED IN PART*